# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# FORT MYERS DIVISION

A.D. an individual,

        Plaintiff,

    vs.

WYNDHAM HOTELS & RESORTS,
INC. and QUORUM HOTELS &
RESORTS, LTD.,

        Defendant(s).

Case No.:  22-cv-00643

COMPLAINT

DEMAND FOR JURY TRIAL

## COMPLAINT

COMES NOW the Plaintiff A.D. ("Plaintiff" or "A.D."), by and through the undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

## INTRODUCTION

1. For decades, criminal sex traffickers have brazenly operated in and out of hotels throughout this country. Victims of sex trafficking are taken to hotel and motel rooms to be repeatedly trafficked, sexually assaulted, demeaned and left with multiple unaddressed injuries, while hotel operators and hospitality giants pay lip service to campaigns against sex trafficking, turning a blind eye to criminal misconduct and collecting profits from the criminal misconduct at the expense of

1

human life, human rights, and human dignity.

2.      Defendants know and have known for decades that sex trafficking repeatedly occurs at their respective locations and under their flags throughout the country. Rather than taking timely and effective measures to thwart this epidemic, Defendants have instead chosen to ignore and thereby facilitate commercial sex trafficking on their property, enjoying the monetary profit and other benefits stemming from rooms rented for the purpose of sex trafficking, while making no attempt to raise awareness or put an end to the repeated abuses of victims at their property.

3.      This action for damages is brought by the Plaintiff, a survivor of sex trafficking hereinafter identified by her initials A.D., under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA").

4.      A.D. was trafficked for commercial sex in Hillsborough County in Florida.  A.D. was sold via commercial sex transactions at the Defendants' hotel property, where force, fraud, and coercion were used against her, while Defendants turned a blind eye and continued to benefit.

5.      A.D. was advertised for sex on various websites known for trafficking, whereby Defendants provided open access to these known websites permitting traffickers and buyers to enable, facilitate, and otherwise assist in the harboring of

2

A.D. for the purpose of sex trafficking.

6.      Upon information and belief, these websites were repeatedly used by the trafficker to control and arrange for A.D. to be sold repeatedly to buyers who frequented the Defendants' hotel property to purchase victims of sex trafficking, including A.D.

7.      With knowledge of the problem, and as a direct and proximate result of Defendants' multiple failures to act, mandate, establish, execute, and/or modify their anti-trafficking efforts on their hotel property, A.D. was sex trafficked, sexually exploited, and victimized repeatedly at Defendants' hotel.

8.      The Plaintiff brings this action pursuant to the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595, against the Defendants who, motivated by profits and the value of the "good will" of their brand, refused to institute meaningful steps to stop trafficking, and instead continued to operate a venture which enabled, harbored, held, facilitated, or any combination of the foregoing, the repeated and continuous trafficking, exploitation, and victimization of A.D. for their own benefit.

9.      The Plaintiff brings this action for damages against the Defendants listed herein for knowingly benefiting from facilitating a venture that they knew, or should have known, to be in violation of the TVPRA.  Defendants turned a blind-eye to more than a decade of direct knowledge regarding anti-trafficking efforts

3

and failed in their mandated and assumed duties to protect Plaintiff and others from sex trafficking.

## PARTIES

10.    Plaintiff A.D. is a natural person who resides in Collier County, Florida.

a. Plaintiff A.D. was living at home with her parents, fully employed and enrolled in college when she was first beckoned to a hotel where she was fraudulently induced, coerced and sexually assaulted before being sold for the purposes of commercial sex throughout Hillsborough, Collier, and Lee Counties. The Plaintiff is a victim of trafficking pursuant to 22 U.S.C. §7102 (17) and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C §7102 (16).

b. Due to the sensitive, private, and potentially retaliatory nature of the allegations, this Court has granted Plaintiff A.D.'s request to proceed under a pseudonym to ensure Defendants keep Plaintiff's identity confidential throughout the pendency of the lawsuit thereafter.[1]

11.    Defendant Wyndham Hotels and Resorts, Inc. ("Wyndham") is one of the largest hotel brands in the world with nearly 9,000 branded properties in more

---

[1] *A.D. v. CorePoint Lodging*, No. 2:22-cv-00095, ECF No. 159.

than eighty (80) countries. It is headquartered at 1 Sylvan Way, Parsippany, New Jersey 07054. Wyndham Hotels and Resorts, Inc. is a Delaware corporation and can be served by its registered agent, Corporate Creations Network, Inc., at 3411 Silverside Road, Tatnall Building Suite 104, Wilmington, Delaware 19810.

    a. Defendant Wyndham Hotels and Resorts, Inc. is the successor entity to Wyndham Worldwide Corporation. Defendant Wyndham Hotels and Resorts, Inc. retains successor liability for wrongful acts of its predecessor, Wyndham Worldwide Corporation.

    b. Defendant Wyndham owned, supervised, and/or operated the Wyndham® Tampa Westshore ("Wyndham Tampa Westshore") hotel located at 700 N. Westshore Blvd., Tampa, Florida 33609, where A.D. was trafficked.

    c. As stated previously, Defendant Wyndham conducts and operates business throughout the state of Florida.

    d. Wyndham is subject to the jurisdiction of this Court because it regularly conducts business in the State of Florida; derives substantial revenue from services rendered in Florida, including through the operation of numerous hotels in Florida such as the Wyndham branded hotels; has caused indivisible injuries to A.D. in Florida; and profited from illegal sex trafficking involving Plaintiff

at its hotel.

e. Wyndham is the principal in an agency relationship with the Wyndham Tampa Westshore. In addition to Wyndham's liability under TVPRA Section 1595, Wyndham is vicariously liable for the acts and/or omissions of the staff at its Wyndham Tampa Westshore and all of its franchisee hotels.

f. The Wyndham Tampa Westshore where A.D. was trafficked has apparent agency for Wyndham so as to establish vicarious liability under Florida law, in addition to an actual agency relationship.

g. Wyndham has ratified the actions and inactions of the Wyndham Tampa Westshore.

h. Wyndham exercises day-to-day control over the Wyndham Tampa Westshore through its brand standards and retains control over the Wyndham Tampa Westshore property under the terms of its operation and franchise agreements.

i. Defendant Wyndham and the Wyndham Tampa Westshore is a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Wyndham Tampa Westshore where the Plaintiff was trafficked for commercial sex acts. Defendant Wyndham and the Wyndham Tampa Westshore,

6

each share the common policies and practices complained of herein.

j. Defendant Wyndham and the Wyndham Tampa Westshore jointly employ or ratify the employment of individuals through horizontal joint employment and/or vertical joint employment.

k. As an integrated enterprise and/or joint employer, Defendant Wyndham and Wyndham Tampa Westshore are separately and jointly responsible for compliance with all applicable laws.

l. As an integrated enterprise and/or joint employer, Defendant Wyndham and Wyndham Tampa Westshore are jointly and severally liable for any damages caused by their employees.

m. As the principal and as a hotel operator, Defendant Wyndham controls the training, policies, and decisions on implementation and execution of policy for its branded property, including the Wyndham Tampa Westshore where Plaintiff was trafficked.

n. Defendant Wyndham maintains that it considers guest safety and security to be important and requires the hotels in its portfolio to comply with Wyndham brand standards and all local, state, and federal laws.

o. Upon information and belief, Defendant Wyndham controls a uniform and required reservation and marketing system, credit

processing system, training and policy on brand standards, including any standards, or lack thereof, on human trafficking, hotel furniture, amenities, food and beverages, cleanliness, or other hotel brand related policies published and communicated via property management systems with back-end management by Wyndham, Wi-Fi qualifications and/or Wi-Fi providers, language and policy used on internet landing pages, thresholds for cybersecurity, including internet access logs, filtering and/or other guest protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at the Wyndham Tampa Westshore where Plaintiff was trafficked.

p. Through Wyndham's relationship with the staff at the Wyndham Tampa Westshore where Plaintiff was trafficked and where traffickers of Plaintiff were guests or visitors, Wyndham knowingly benefited, or received something of value, from its participation in a venture which it knew or should have known violated the TVPRA through, *inter alia*, royalty payments, licensing fees, and percentages of the gross room revenue which Wyndham is entitled to under operation and franchise agreements.

q. Wyndham benefits financially from room rentals and other

incidentals recognized through renting rooms at the brand property in which the Plaintiff was commercially sex trafficked.

r. Wyndham has benefited by turning a blind eye to rampant commercial sex trafficking and claiming they have no control over the problem of prostitution and sex trafficking at their branded hotels.

12. Defendant Quorum Hotel & Resorts, Ltd. ("Quorum"), doing business as the Wyndham® Westshore ("Wyndham Tampa Westshore"), is a Florida domestic limited partnership and is one of Defendant Wyndham's branded property. Defendant Quorum was involved in the staffing and operation of the Wyndham Tampa Westshore located at 700 N. Westshore Blvd., Tampa, Florida 33609, where the Plaintiff was trafficked for sex. Through its relationship with Defendant Wyndham and the perpetrators who trafficked A.D. at the Wyndham Tampa Westshore, Defendant Quorum knowingly benefited or received something of value from operating a venture which enabled, harbored, held, facilitated, or any combination of the foregoing, the repeated and continuous trafficking, exploitation, and victimization of A.D. for their own benefit. Defendant Quorum may be served with service of process by serving its registered agent, W. A. Farris c/o Chase Hotel Company, at 5429 LBJ Freeway, Suite 625, Dallas, Texas 75240.

13.     Defendant Wyndham Hotels & Resorts, Inc. ("Wyndham") flies its flag and sets standards at the Wyndham Tampa Westshore, where Wyndham shares decisions with Defendant Quorum Hotel & Resorts, Ltd. ("Quorum"). Together, Wyndham and Quorum are responsible for the injuries at the Wyndham Tampa Westshore, located at 700 N. Westshore Blvd., Tampa, Florida 33609, which is a Wyndham branded hotel.

14.     Defendant Wyndham Hotels & Resorts, Inc. may be referred to as the "Brand Hotel Defendant."

15.     Whenever reference is made in this Complaint to any act, deed, or conduct of the Defendants, the allegation is that the Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendants.

## JURISDICTION AND VENUE

16.     This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States and this Court has supplemental jurisdiction over Plaintiff's claims that do not arise under federal law because each claim is "so related to claims in the action within [this Court's] original jurisdiction that they form part

10

of the same controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in the judicial district where this action was brought.

## SEX TRAFFICKING UNDER FEDERAL LAW

18.     The requirements for liability under TVPRA § 1595 on a beneficiary theory can be stated as follows: (1) the person or entity must "knowingly benefit[], financially or by receiving anything of value," (2) from participating in a venture, (3) that the "person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a).

19.     Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion."  This definition combines the three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

20.     To best understand the mechanism by which sex trafficking is prohibited by federal criminal law, it's best to address these elements in the reverse. Sex trafficking is slavery for the *purpose* of commercial sex, a lens on the already

11

existing crimes prohibited by 18 U.S.C. § 1589 and §1590. The crime of slavery can then be divided into the two (2) elements remaining: the act and the means. The *act* is the "harboring, transporting, providing, or obtaining," of forced labor, codified as a violation of 18 U.S.C. §1590, while the *means* is labor "obtained or provided by force, fraud or coercion" and is codified as a violation of 18 U.S.C. §1589.

21.     Thus, while the complete definition of 'sex trafficking' is found in the TVPRA under 22 U.S.C. § 7102, it is nevertheless a long- recognized and familiar atrocity.

<u>**FACTUAL ALLEGATIONS**</u>

**A.  BRAND HOTELS CONTROL THE HOSPITALITY INDUSTRY**

22.     Upon information and belief, between at least 2008 to 2012 Defendant Wyndham held meetings among its executives, directors, and managers at which sex trafficking in its hotels was discussed.

23.     Upon information and belief, between at least 2008 to 2012 the Brand Hotel Defendants held meetings through their trade organizations in which sex trafficking in their hotels was discussed.

24.     Upon information and belief, during at least 2008 to 2012, emails were exchanged by employees of Defendants' respective brand that related to sex trafficking in hotels, including Defendants' hotel.

12

25.     As industry leaders, Defendant each failed to articulate policy, process, or procedure that would measure the extent of the trafficking problem at their branded locations. They essentially all allowed their colleague brand to perpetuate the lie that sex trafficking was not a problem on their brand property. Moreover, Defendants did not articulate a policy, process, or procedure that could measure whether the "employee training" had the effect of reducing instances or expected instances of human trafficking.

26.     Defendants collectively declined to implement policies that would likely have the effect of reducing the billions of dollars in sex trafficking profits. As a whole, Defendants did not call for stricter room rental requirements. For example, Defendants did not require ID or names of every person staying in the room; did not limit the number of people allowed to stay in a room; did not require a credit or debit card to be placed on file with a name on it (accepting prepaid credit cards and even cash), and did not monitor reservation patterns maintained and owned by their brand central reservation systems, data of which could only be analyzed by the brand Defendant with backend access.  In short, Defendants refused to communicate to traffickers "your business and your money are not welcome here."

27.     Through this coordinated effort, Defendants were able to rest assured they would not have to implement effective policies and procedures. Given that

human trafficking does more than $100 billion in business a year and the fact that a large percent of all sex trafficking occurs at hotels and motels—there can be no doubt that Defendant, as an industry, generate billions of dollars every year from human trafficking.

28.   Defendants' coordinated efforts created an industry standard of giving lip service to tackling human trafficking while in practice implementing nothing meaningful or effective. Defendants guaranteed that they would not have to compete with a national branded property that put together a policy that eliminated trafficking from their branded property. While it would be challenging and expensive (both business expenses and lost revenues from traffickers) to implement effective policies, it is apparent that an effective policy would create a long term competitive advantage for the individual defendant. In short, a business that implemented an effective policy could easily provide reportable data on how it reduced trafficking at its brand property. Moreover, it could exploit the fact that other defendants are completely ignoring that a problem exists at their brand property. The complying hotel could explain how other brand hotels will never be able to effectively battle the problem until they admit it exists on their property. Thus, in the long run, an effective policy would generate public support and create brand loyalty, resulting in greater revenues and profits.

**B.  THE DEFENDANTS' ACTUAL AND/OR CONSTRUCTIVE KNOWLEDGE OF SEX TRAFFICKING AT THEIR HOTEL**

29.    Defendants have been on notice of repeated incidences of sex trafficking occurring at their brand hotels, yet they failed to take the necessary action to meaningfully address sex trafficking and still persist in failing to take the necessary action to meaningfully address sex trafficking at their hotels.

30.    Several courts have found failure to implement policies sufficient to combat a known problem in one's operations can rise to the level of willful blindness or negligence.[2]

31.    Defendant Wyndham had actual and/or constructive knowledge of sex trafficking, including A.D.'s sex trafficking and victimization, occurring on its branded properties via the following:

    a.    Defendant Wyndham owns, supervises, or operates the Wyndham Tampa Westshore hotel located at 700 N. Westshore Blvd., Tampa, Florida 33609. Wyndham failed to implement and enforce any of its own policy or policies and protect Plaintiff A.D. from being sex trafficked.

    b.    For years Defendant Wyndham has been on notice of repeated incidences of sex trafficking occurring on its Wyndham Tampa Westshore branded property, yet Defendant Wyndham has failed

---

[2] *See Brown v. Corr. Corp. of Am.*, 603 F.Supp.2d 73, 81 (D.D.C. Mar. 26, 2009); *Trollinger v. Tyson Foods, Inc.*, 2007 WL 1574275, at *12 (.E.D. Tenn. May 29, 2007).

to take action to prevent sex trafficking at Wyndham brand property and still persists in failing to take necessary action to prevent sex trafficking on its property. Defendant Wyndham's inattention in this regard enabled and contributed to the sex trafficking the Plaintiff suffered at the Wyndham Tampa Westshore.

c. There are numerous examples across place and time of Defendant Wyndham's knowledge of sex trafficking on its branded property and its continued, total inattention to preventing and remedying the blight of human trafficking on the lives and liberties of its victims.

d. Upon information and belief, Plaintiff alleges that Wyndham implemented means which gave it the ability to monitor various guest reviews indicating prostitution, trafficking, and guest safety issues at its branded hotels.

e. In 2011, Defendant Wyndham's predecessor entity Wyndham Worldwide Corporation, signed the Code, but as evidenced by the widespread sex trafficking which continued to occur at Defendant Wyndham's branded property, Defendant Wyndham did not practice what it preached. Wyndham trained only *some* of its employees to look for signs of trafficking.[3] Defendant Wyndham's

---

[3] Katie Lobosco, *Super 8 workers trained to spot sex trafficking*, CNN BUSINESS (Nov.

adoption of the Code was nothing more than a strategic maneuver through which it sought a shield against liability, rather than a sword against human trafficking.

f.  Despite Defendant Wyndham's anti-trafficking stance, Defendant Wyndham failed to implement and enforce any of its own policy or policies, including with respect to the Wyndham Tampa Westshore hotel. Defendant Wyndham knew or should have known that the Wyndham Tampa Westshore hotel were located in an area known for sex trafficking activity, and sex trafficking and prostitution continued to regularly occur on and around their branded hotel premises, including when A.D. was trafficked. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its branded hotels, Defendant Wyndham failed to take adequate measures to prevent the misconduct.

g.  Defendant Wyndham voluntarily assumed the responsibility to implement sufficient policies to combat sex trafficking at its branded property through its partnerships with ECPAT and Polaris, and its activities with the AHLA and other trade

---

18, 2014), https://money.cnn.com/2014/11/18/news/companies/days-inn-sex-trafficking/.

organizations. However, Wyndham failed to implement its own policies and those recommended to it by the above mentioned advocacy organizations which led to the inevitable consequence of continued trafficking at its branded property, including the trafficking of A.D.[4]

h. Defendant Wyndham knew of sex trafficking occurring on its branded hotel property. Wyndham knew that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. Wyndham knew that all of this violent and criminal activity was occurring at their branded property and therefore knew that sex trafficking was occurring at their branded property. Yet Wyndham allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Wyndham branded hotel. Specifically, Wyndham facilitated the trafficking through their practices, policies, and procedures. Wyndham failed to take

---

[4] *See e.g.*, https://www.bakerdonelson.com/Franchisor-Liability-for-Franchisee-Actions-09-19-2011 (if a franchisor voluntarily assumes responsibility for some aspect of the franchise operations, it may be responsible if it is negligent in doing so).

appropriate action to prevent the trafficking of individuals for sex so that Wyndham could continue to profit from the business that trafficking brings, including business from out-of-state.

i.  Defendant Wyndham should have known of sex trafficking occurring on its branded hotel property. Wyndham knew that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. Wyndham knew that all of this violent and criminal activity was occurring at their branded property therefore they knew or should have known that sex trafficking was occurring at their branded property. Yet, Wyndham allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the La Quinta®. Specifically, Wyndham facilitated the trafficking through their practices, policies, and procedures. Wyndham failed to take appropriate action to prevent the trafficking of individuals for sex so that Wyndham could continue to profit from the business that trafficking brings, including business from out-of-state.

j. Wyndham knew or should have known that the Wyndham Tampa hotel where Plaintiff A.D. was trafficked were located in areas known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff A.D. was trafficked.

k. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant Wyndham has repeatedly failed to stop these actions.

l. Wyndham was in an agency relationship with the Wyndham Tampa Westshore branded hotel offering public lodging services in the hotel. This agency relationship was created through Defendant Wyndham's exercise of an ongoing and systemic right of control over the Wyndham Tampa Westshore a hotel by Defendant Wyndham's operations, including the means and methods of how Wyndham branded hotel conducted daily business through one or more of the following actions:

  i. providing the software, hardware, and platforms where suspicious activity or other concerns could be addressed with the Brands;

  ii. providing reservation platforms where payment modes

20

and suspicious reservations would suggest trafficking;

iii.  providing new hire orientation on human rights and corporate responsibility;

iv.  providing training and education to Wyndham® branded hotels through webinars, seminars, conferences, and online portals;

v.  providing and controlling customer review and response platforms;

vi.  hosting online bookings on Wyndham's domain;

vii.  requiring Wyndham® branded hotels to use Defendant Wyndham's customer rewards program;

viii.  requiring Wyndham® branded hotels to use Defendant Wyndham's property management software;

ix.  requiring Wyndham® branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

x.  providing IT support for all property management systems, owned, operated and required by Wyndham;

xi.  setting employee wages;

xii.  making employment decisions;

      xiii.  advertising for employment;

      xiv.  sharing profits;

      xv.  standardized training methods for employees;

      xvi.  building and maintaining the facility in a manner specified by the owner;

      xvii.  standardized or strict rules of operation;

      xviii. regular inspection of the facility and operation by owner;

      xix.  fixing prices; or

      xx.  other actions that deprive Wyndham® branded hotels of independence in business operations.

m. Upon information and belief, Defendant Wyndham tracked and controlled data regarding guest information, including physical location of guests via their internet enabled devices, guest internet activity via their Wi-Fi services, and inventory information at each branded location. All of this data information was under Defendant Wyndham's management and control and included all of the indicia of A.D.'s trafficking. This data included the details of A.D.'s check-in, the internet activity associated with her reservation, including Backpage.com advertisements listing the hotel's address, her location at the hotel, which included the notable fact that she

rarely, if ever, left the hotel despite extended stays, and the spike in requests for towels and other items from inventory.

n. An apparent agency also exists between Defendant Wyndham and Wyndham® branded hotels. Defendant Wyndham held out Wyndham® branded hotels to the public as possessing authority to act on its behalf.

o. Given Defendant Wyndham's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its branded hotels, including Wyndham® branded hotels, Defendant Wyndham breached its duties in the following ways:

    i. did not adequately distribute information to assist employees in identifying human trafficking;

    ii. failed to mandate a process for escalating human trafficking concerns within the organization;

    iii. failed to mandate managers, employees, or owners attend training related to human trafficking;

    iv. failed to provide new hire orientation on human rights and corporate responsibility;

    v. failed to provide any or adequate training and education

23

on human trafficking through webinars, seminars, conferences, and online portals;

vi. failed to develop and hold or require ongoing training sessions on human trafficking;

vii. failed to provide or mandate checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention;

viii. failed to evaluate universal reservation systems for suspicious booking activities;

ix. failed to evaluate anti-trafficking measures for effectiveness and make changes where necessary;

x. failed to ban cash or prepaid credit cards as payment; and

xi. failed to filter, monitor, and block classified advertising websites known for commercial sex, such as Backpage.com and Craigslist.com, from being accessed via hotel internet service.

p. Upon information and belief, Defendant Wyndham requires its branded hotel property to use a property management system, which is linked to Defendant Wyndham's corporate network and

24

data center, for, among other things, receiving reservations, and processing credit card transactions.

q. Defendant Wyndham uses a centralized reservation system, and states in its privacy policy that it collects information such as contact information, demographics, financial information, government-issued identification numbers, accommodation preferences, location, IP addresses, and social media content from hotel guests.[5]

r. Defendant Wyndham requires its hotels to carry a certain level of Wi-Fi internet access or security for hotel guests, through a limited number of vendors that Defendant Wyndham specifies and requires.[6]

s. In 2016, Defendant Wyndham approved two internet vendors.[7] In 2020, Defendant Wyndham approved six: Deep Blue Communications, Safety NetAccess, Air2Data High Speed Wireless,

---

[5] *See* Wyndham Privacy Notice, *available at* https://www.wyndhamhotels.com/about-us/privacy-notice-more-info?lightbox=/content/whg-ecomm-responsive/en-us/whg/about-us/privacy-notice-more-info.display.html, last accessed August 26, 2020.

[6] *See* 2020 Technology Guide, Q1 2020, published by Wyndham Strategic Sourcing. Brand Standards described in this document and set by Wyndham in 2016 state that "Wi-Fi must be installed and offered complimentary in all guestrooms/suites, lobby, business center, meeting room space and public areas."

[7] *See* Q3 2016 eNews Sourcing News & Best Practices by Wyndham Hotel Group.

ITG Networks, Allbridge, and Wyndham HCS.[8]

t.  Upon information and belief, Defendant Wyndham requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place, including those that give Defendant Wyndham the ability to access and harvest that internet data.[9]

u.  Upon information and belief, Defendant Wyndham retains and/or can view internet access logs, IP addresses, and other logs reflecting wireless internet access to its hotel property, including the type of monitoring described above.

v.  This access may have included branded hotels' guest information registration, including names, date of booking, and length of stay.

w.  Upon information and belief, Defendant Wyndham can therefore see unusual or suspicious bookings, for instances, when clientele at its branded hotels is disproportionately male for same-day bookings for one-night stays, when bookings rotate somewhat

---

[8] *See* https://web.archive.org/web/20200427225133/http://transfer.nxtbook.com/nxtbooks/mcneill/vendor_2011winter/offline/mcneill_vendor_2011winter.pdf.

[9] *See* Top 10 Hotel Wi-Fi Features, published by Deep Blue Communications in November 2014. One of Wyndham's longest running certified wireless internet vendors, Deep Blue Communications, includes in its marketing materials that (emphasis added) "**customized landing pages** protect both the guests and hotel from the hassle of disputed charges, and **protect the hotel from guests who may use the Internet for illegal purposes**."

uniformly throughout its branded property, or when in the case of A.D., reservations for extended stays were requested.

x.  Upon information and belief, Defendant Wyndham has the capacity to monitor and control brand property hotel guests' access through hotel Wi-Fi to certain websites.[10]

y.  Upon information and belief, Defendant Wyndham can see when branded property hotel guests are accessing sex buyer advertisements and websites through hotel Wi-Fi, including Plaintiff's advertisements on Backpage.com.

z.  Upon information and belief, and contrary to ECPAT best practices, Defendant Wyndham failed to block or otherwise limit access to sex buyer advertisements and websites through Wi-Fi.

aa. Upon information and belief, Defendant Wyndham has the ability to see disproportionately male clientele registering for short hotel stays while accessing backpage.com and other sex buyer advertisements and websites extended to the hotel where Plaintiff was trafficked for sex.

---

[10] *See, e.g.,* https://money.cnn.com/2016/07/15/news/companies/starbucks-mcdonalds-wifi-porn/index.html; https://endsexualexploitation.org/articles/filterpublicwifi_starbucks_library_congress/.

bb. Despite access to information comprising clear sex trafficking indicators, Defendant Wyndham continued to permit and profit from hotel guests who rented hotel rooms to buy sex, including those who bought Plaintiff.

cc. Upon information and belief, Defendant Wyndham monitors and reviews reports of criminal activity, including through online reviews, at its branded property.

dd. Upon information and belief, Defendant Wyndham provides a platform for brand property employees to report, at their discretion, to the Brand suspicious activity occurring at their branded hotel. Defendant Wyndham controls and houses this collective data from all branded property.

ee. Thus, for several years, Defendant Wyndham has demonstrated actual and/or constructive knowledge of the rampant culture of sex trafficking which tragically occurs on its Wyndham® branded property throughout the country. This same entrenched, pervasive actual and/or constructive knowledge of sex trafficking facilitated the sex trafficking of Plaintiff A.D. at the Wyndham® hotel that forms the basis of this complaint.

ff. Upon information and belief, Defendant Wyndham monitors

28

customer reviews and complaints for all brand property.

gg. Upon information and belief, the branded property depends on Defendant Wyndham for notification of negative customer reviews.

hh.    Upon information and belief, Defendant Wyndham, not the branded property, house and control the data regarding customer reviews.

### C.    THE SEX TRAFFICKING OF A.D. AT DEFENDANT HOTELS

32.    One of the lives devalued and otherwise adversely affected by the hospitality industry's inattention to the prevention and eradication of sex trafficking was that of A.D.

33.    In November of 2011, A.D. met a man who she was interested in ("hereinafter referred to as "Trafficker 2"). He took advantage of her innocence and forced her into a sexual encounter. Trafficker 2 subsequently courted her and manipulated her into thinking they were in love. While "dating," Trafficker 2 would manipulate A.D. into numerous non-consensual sexual encounters; forced her to take drugs; and take the blame for his criminal acts. Trafficker 2 would consistently take advantage of A.D. and would soon sex traffick her in hotels throughout Central Florida.

34.    After months of "dating," Trafficker 2 suggested A.D. move in together. Because he was a convicted felon and registered sex offender, he forced A.D. to

enter into a lease agreement. In order to make money to sustain their life together, Trafficker 2 suggested A.D. work to make extra money.

35. Under the ruse of a modeling job advertised on Backpage.com, Trafficker 2 forced A.D. to work. During her "interview" for the modeling job, A.D. met a man (hereinafter referred to as "Trafficker 1") who raped her into submission.

36. While victimized by her traffickers, A.D. was subjected to repeated instances of rape, physical abuse, verbal abuse, exploitation, psychological torment, kidnapping, and false imprisonment at the Defendants' hotel property between approximately February 2012 and March 2012.

37. Plaintiff was subjugated to sex trafficking at the Wyndham® Tampa Westshore ("Wyndham Tampa Westshore"), currently a Holiday Inn Tampa Westshore, located at 700 N. Westshore Blvd., Tampa, Florida 33609, between approximately February 2012 to March 2012.

38. Trafficker 2 instructed A.D. to rent rooms in her name using cash. A.D. was required to pay for the room on a nightly basis. In the morning, A.D. would request to extend their stay for a subsequent night.

39. Trafficker 2 forced A.D. to perform commercial sex acts for approximately one week continuously at the Wyndham Tampa Westshore.

40. Trafficker 2 advertised A.D. on Backpage.com, which would include the name and address of the Wyndham Tampa Westshore hotel.

41. Trafficker 2 developed relationships with several of the Wyndham Tampa Westshore employees and had illicit agreements with them to conceal their sex trafficking operation. Within the first 24 hours of being at the Wyndham Tampa Westshore, A.D. was forced to perform commercial sex acts with up to 18 to 20 men. The sex buyers would enter the hotel through the front lobby in clear view of the front desk between the peak hours of 11:00pm to 5:00am. Accordingly, the traffic and parade of unregistered male guests coming in and out of A.D.'s hotel room was tremendous. This procession of men would have been open and obvious to anyone working at the Wyndham Tampa Westshore.

42. For the remainder of the days that A.D. was trafficked at the Wyndham Tampa Westshore, A.D. was raped by up to 12 to 15 men per day. Over a week period, in excess of 100 men arrived at the Wyndham Tampa Westshore rooms to forcefully rape A.D.

43. The only time A.D. was allowed to leave her room was to go down to the front lobby to extend her stay. Because she was confined to her hotel room for several days at a time, her trafficker would bring food to the room. To keep her confined and unable to escape, her trafficker would arrange buyers to come to the hotel room and tell them which room to go to.

44. A.D.'s trafficker, Trafficker 2, would stay with A.D. at the Wyndham® Tampa Westshore. On several occasions he would sit in the parking lot while A.D.

was raped. After each client, Trafficker 2 would return to the rented room to collect the cash.

45. When housekeeping was near the rented room, A.D. would hand housekeeping large piles of dirty linens and towels and request additional clean linens, towels, and 8 to 10 hand towels at a time.

46. The Wyndham Tampa Westshore security cameras undoubtedly filmed a great deal of this obvious traffic as well as the victim A.D. as she entered and left the premises. No one at the corporate level apparently ever utilized their alleged mandated surveillance and security to prevent the flagrant sex trafficking of A.D. from occurring on the Wyndham Tampa Westshore hotel premises.

47. Through hotel staff and employees, Defendants knew or should have known that A.D. was being trafficked for sex due to several well-known red flags, including but not limited to:

      a. Large amounts of exposed used condoms in the bathroom trash can, empty lube bottles, lingerie, sex toys, bodily fluids on the sheets and towels, and other sex-related items in the hotel rooms;

      b. Payments for the rooms in cash, or cash substitutes such as a prepaid credit card;

      c. A.D.'s physical appearance (malnourished, bruised, beaten, drugged, and inappropriate attire);

d.  A continuous procession of men entering and leaving A.D.'s room;

e.  Excessive requests for sheets, cleaning supplies, towels, and room service;

f.   The personal relationship between various hotel staff and A.D.'s trafficker; and

g.  The direct employee encounters with A.D. and her trafficker inside the Wyndham Tampa Westshore.

## F.  THE DEFENDANTS FACILITATED THE TRAFFICKING OF A.D.

48.    Defendants profited from the sex trafficking of A.D. and knowingly or negligently aided, enabled, and facilitated the sex trafficking of A.D. The Defendants leased rooms to A.D.'s traffickers when they knew, or should have known, that her trafficker was using their room to subject A.D. to repeated exploitation as he forced her into sexual servitude.

49.    Defendants knew, or should have known, that A.D. was being trafficked and that the Defendants were knowingly benefiting financially from said exploitation, because A.D.'s trafficker frequented the Defendants' hotel.

50.    Defendants knew, or should have known, that A.D. was being trafficked because A.D. constantly entertained traffic to appease her traffickers' daily quotas and their behavior indicated they were using the Defendants' hotel for his illegal sex trafficking activities.

51.     Defendants actively participated in this illegal endeavor by knowingly or negligently providing lodging in which to harbor A.D. while he was trafficking her.

52.     Defendants profited from the sex trafficking of A.D. and knowingly or negligently aided and participated with A.D.'s trafficker with his criminal activity. The Defendants took no action as A.D. repeatedly visited the hotel, often with different guests, avoiding eye contact, and dressing inappropriately for the weather.

53.     The Defendants all had the opportunity to stop A.D.'s trafficker and offenders like him from victimizing A.D. and others like her. Instead, every Defendant failed to take reasonable measures to stop sex trafficking from occurring in their hotels.

54.     The Defendants all financially benefited from the sex trafficking of A.D., and other victims like her, and developed and maintained business models that attract and foster the commercial sex market for traffickers and buyers alike.

55.     Defendants benefit from the steady stream of income that sex traffickers bring to their hotel brand.

56.     Defendants financially benefit from their ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

57.     Defendants have long been aware that free Wi-Fi is attractive to

34

traffickers yet failed to provide adequate security to protect Plaintiff, including adequate measures to monitor Wi-Fi access. The myriad types of electronically stored information ("ESI") generated in the use of a Wi-Fi network can manage and track communications and activity originating from devices granted access. By way of the ESI generated through the use of Defendants' Wi-Fi networks, Defendants had information in their custody, control, and possession that enabled them to identify the purpose for which their Wi-Fi network and their property were being used and by which they profited.

58.    Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on their property despite assurances to the public, guests, and other stakeholders that they were taking these steps.

59.    Defendants maintained their deficiencies to maximize profits by:

    a. Reducing the cost of training employees and managers on how to spot the signs of human trafficking and sexual exploitation and what steps to take;

    b. Lowering operating costs and management costs by not analyzing the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the

steps necessary to remedy the issues at relevant locations or else hold the franchisee accountable and terminate their franchise agreement;

c. Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotels;

d. Not refusing room rentals, or reporting guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

e. Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation.

60. As a direct and proximate result of these egregious practices on the part of the Defendant Hotel, A.D. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## CAUSES OF ACTION

36

### A.    COUNT ONE – 18 U.S.C §1595 ("TVPRA")
### (Against all Defendants)

61.    The Plaintiff A.D. incorporates each foregoing allegation.

62.    A.D. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

63.    The Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, the Defendants had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of 18 U.S.C. §1591 (a). At all relevant times, the Defendants breached this duty by participating in a venture which facilitated the harboring and providing of A.D. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

64.    The Defendants have financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade. Moreover, the Defendants directly benefited from the trafficking of A.D. on each occasion they received payment for rooms that she was being kept in at the Defendants' hotel. The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of A.D.'s injuries and damages.

65.    A.D. has suffered substantial physical and psychological injuries as the

result of being trafficked and sexually exploited at the Defendants' hotel and property in violation of 18 U.S.C. §1591(a).

## **PRAYER FOR RELIEF**

WHEREFORE the Plaintiff requests that the jury selected to hear this case render a verdict in her favor on all counts alleged, and against each and every named Defendant, separately and severally, and that it award damages to her in an amount which will adequately compensate her for the injuries and damages she sustained due to the Defendants' conduct outlined as follows:

a. All available compensatory damages for the described losses with respect to each cause of action;

b. past and future medical expenses, as well as the costs associated with past and future life care;

    a. past and future emotional distress;

    b. consequential and/or special damages;

    c. all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

    d. disgorgement of profits obtained through unjust enrichment;

    e. restitution;

    f. punitive damages with respect to each cause of action;

    g. reasonable and recoverable attorneys' fees;

h.  costs of this action; and

i.  pre-judgment and all other interest recoverable

Also, on the basis of the foregoing, the Plaintiff requests that a jury be selected to hear this case and render a verdict for the Plaintiff, and against the Defendants, and that it award damages to the Plaintiff in an amount which adequately reflects the enormity of the Defendants' wrongs, and which will effectively prevent other similarly caused acts. Further, the Plaintiff requests that the Court enter judgment consistent with the jury's verdict, and prays for any other damages and equitable relief the Court or jury deems appropriate under the circumstances.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY**

Dated:  October 11, 2022                              **RESPECTFULLY SUBMITTED,**

*/s/ Kathryn L. Avila*
**Kathryn L. Avila** (Fla. Bar No. 1019574)
**Emmie J. Paulos** (Fla. Bar No. 99010)
LEVIN PAPANTONIO RAFFERTY
316 S. Baylen St. Suite 600
Pensacola, Florida 32502
T: 850-436-6246
F: 850-436-6271
E: kavila@levinlaw.com /
epaulos@levinlaw.com

*Attorneys for Plaintiff*

39